In re Michael J. CORMIER and Linda E. Cormier, Debtors.

No. GT 05–16241.

United States Bankruptcy Court, W.D. Michigan.

Feb. 14, 2008.

James W. Boyd, Esq., Traverse City, Michigan, Chapter 7 Trustee, "Trustee."

Wallace H. Tuttle, Esq., Traverse City, Michigan, Attorney for Michael J. Cormier and Linda E. Cormier, "Debtors."

## OPINION REGARDING TRUSTEE'S PROPOSED SALE OF STOCK

JAMES D. GREGG, Chief Judge.

### I. *INTRODUCTION*

The Sixth Circuit Bankruptcy Appellate Panel ("BAP") has issued a recent decision which gives this court pause. *Olson v. Anderson (In re Anderson)*, 377 B.R. 865 (6th Cir. BAP 2007) ("*Anderson BAP*"). In this contested matter, what was to have been a relatively straightforward opinion about the Debtors (who were the successful high bidders) objecting to the Trustee's auction sale has become considerably more complicated. If the *Anderson BAP* opinion is narrowly construed, based upon its unique facts, it is probably correctly decided. However, if *Anderson BAP* is broadly construed, its result may be far-reaching, and drastically modify the federal exemption design, resulting in some debtors figuratively and fortuitously sliding down a rainbow to be gifted a pot of unwarranted bankruptcy largesse.

### II. *ISSUES*

May the Trustee sell stock in a closely held Michigan corporation at an auction sale? Did the stock cease to be property of the estate, thereby precluding the Trustee's sale, based upon the Debtors' claimed federal catchall exemption? Do the Debtors have standing to object to the sale even though they were the highest bidder?

### III. *JURISDICTION*

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334 & 157(a) and Local Rule 83.2(a) of the United States District Court for the Western District of Michigan (which refers all bankruptcy cases and related matters to this bankruptcy court). This matter is a core proceeding because it pertains to "exemptions from property of the estate," 28 U.S.C. § 157(b)(2)(B), the "sale of property," 28 U.S.C. § 157(b)(2)(N) and the "administration of the estate," 28 U.S.C. § 157(b)(2)(A).

This opinion constitutes the court's findings of facts and conclusions of law in

accordance with Fed. R. Bankr.P. 7052. This bankruptcy case was filed before the generally effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (commonly referred to as "BAPCPA"). The issues presented are therefore decided under the pre-BAPCPA Bankruptcy Code, 11 U.S.C. §§ 101–1330, inclusive, with statutory references hereinafter noted as " § _____."

## IV. FACTS AND PROCEDURAL BACKGROUND

Michael J. Cormier and Linda E. Cormier, "Debtors," filed their voluntary joint petition under chapter 7 of the Bankruptcy Code on October 10, 2005. Dkt. 1. James W. Boyd, "Trustee," was appointed to administer the bankruptcy case. When the case was filed, the Debtors filed Schedules A–J and their Statement of Financial Affairs. The Debtors failed to disclose their 4.167% ownership interest in stock of TTAP Investments, Inc. (the "stock"), or to claim the stock as exempt property. Only on their Schedule I, pertaining to Current Income, did the Debtors allude to the stock as "Mineral Rights" from which they received $1,277 per month.

At the § 341 meeting ("first meeting"), the Trustee asked about the "Mineral Rights" and first learned of the Debtors' stock ownership. After the first meeting, the Trustee attempted to obtain information regarding the stock. On November 2, 2006, he filed a motion seeking turnover of royalties and corporate documents. Dkt. 14. Thereafter, on November 17, 2006, the Debtors filed their first amended Schedules B and C. Dkt. 17. They listed the stock as jointly owned with a current

market value of $1.00. On Schedule C, they claimed the stock as exempt in the amount of $1.00 under the so-called federal "catchall" exemption, § 522(d)(5).

On December 18, 2006, a stipulation to substitute the Debtors' current attorney for their prior attorney was filed, and the order permitting substitution was entered on December 21, 2006. Dkt. 18 and 20. Second amended Schedules B and C were then filed on February 21, 2007. On Schedule B, in paragraph 13, under "Stock and interests in incorporated and unincorporated businesses," the Debtors finally listed a "4.167% joint stock interest in TTAP Investments, Inc." and stated the "current value" as "$1.00." On Schedule C–Property Claimed as Exempt, the Debtors listed the joint stock interest and claimed exemptions under § 522(d)(5) as follows: Husband—$9,650 and Wife—$4,500. The total amount claimed as exempt equaled $14,150. Once again, the Debtors listed the current value of the stock as $1.00.[1] The Trustee did not object to the Debtors' claimed exemptions.

The Trustee continued to seek information about the stock. While the parties agreed to adjourn the hearing regarding the requested turnover of royalties and corporate records, the Trustee sought and obtained an Order Granting Motion for [Rule] 2004 Examination. Dkt. 22 and 23.

After some additional information was obtained, on October 2, 2007, the Trustee filed his Motion to Sell Stock in TTAP Investments, Inc. (the "Sale Motion"). Dkt. 30. Per the Sale Motion: (1) the corporation itself, TTAP, made an opening offer to purchase the stock in the amount of $26,826; (2) the Debtors then made an

---

1. During his testimony, Michael Cormier stated that he did not know the value of the stock. Tr. III at 35 and 49. However, he conceded that the Debtors have received distributions for approximately ten years. Id. at 37. Using

the "Mineral Rights" distribution listed in Schedule I, stating an amount of $1,277 per month, the Debtors have received over $150,000 in distributions from the TTAP stock.

opening higher offer of $27,000; (3) the Trustee requested to sell the stock to the highest bidder at a subsequent telephone auction; (4) the Debtors were permitted to credit bid their claimed exemption totaling $14,150 toward the purchase price; (5) upon completion of the auction sale, the bankruptcy estate's interest in the stock would be conveyed to the highest bidder by assignment; and (6) the successful bidder would be entitled to receive all royalties and dividend payments commencing November 1, 2007, provided the sale closed on or before October 31, 2007.

After notice and a hearing on October 19, 2007, the court approved the requested auction sale.[2] At that hearing, the court did not recognize any storm clouds approaching—any clouds appeared to be cirrocumulus rather than cumulonimbus in nature. The Debtors' attorney stated: "We have some concerns about the proper authority of the corporation [TTAP Investments, Inc., generally herein "TTAP"] to bid but I believe that will be dealt with at the time of the auction." Tr. I at 3. Then it was stated that "we would have no objection for the court order to be entered." *Id.* The order approving the auction sale, entitled "Order Confirming Sale," was filed on October 24, 2007, signed on October 29, 2007 and entered on October 30, 2007.[3] Dkt. 36 and 40. While the order permitting the auction sale to take place was

being processed for entry, the auction proceeded.

On October 23, 2007, a telephonic auction of the stock occurred. The Debtors' initial opening offer of $27,000 was subject to competitive bidding; after TTAP eventually bid $46,000 for the stock, the Debtors bid $47,000, which was the final bid. Dkt. 37; Tr. III at 2. Almost immediately thereafter, on October 24, 2007, the Trustee filed his "Motion for Entry of Order Confirming Sale of Debtor's [sic] Stock in T.T.A.P. Investments, Inc. Pursuant to Auction Conducted on October 23, 2007" ("Confirmation of Auction Sale Motion"). Dkt. 37. In that motion, the Trustee requested the sale be approved, the sale be closed on or before November 30, 2007, and that if the Debtors, as the successful highest bidder, failed to timely close the sale, the Trustee be authorized to sell the stock to TTAP at its last highest bid of $46,000.

The court promptly set the Confirmation of Auction Sale Motion for hearing on November 2, 2007. Dkt. 38. On October 30, 2007, the Debtors filed their objection to the Confirmation of Auction Sale Motion. Surprise! Because of a glitch, when the hearing commenced on November 2, 2007, the court was unaware of any objection. It believed, because the Debtors were the high bidders, that the sale was uncontested. Wrong![4] The Debtors' attorney then

---

**2.** The transcript of the hearing that took place on October 19, 2007, is referred to herein as "Tr. I." The transcript of the second hearing which took place on November 2, 2007 is referred to herein as "Tr. II." The transcript of the third hearing which took place on November 30, 2007 is referred to herein as "Tr. III."

**3.** This title is misleading. The order permitted the Trustee to conduct an auction sale upon certain terms and conditions. No sale was approved by this order.

**4.** The Debtors' written objection was filed on Tuesday, October 30, 2007. Dkt. 41, with an Addendum filed and served on Wednesday, October 31, 2007. Dkt 42. The Trustee's response was filed and served on Thursday, November 1, 2007. Dkt. 44. It is not surprising that the court did not know of these pleadings. On October 30, the court was in session for a Kalamazoo motion day; on October 31, the court was in session for a Grand Rapids motion day; and on November 1, the court traveled to Traverse City in the morning and conducted pretrial conferences during the afternoon.

argued that the sale of the stock to his own clients should not be approved. (Cumulonimbus clouds erupted in the Traverse City courtroom. This is only supposed to happen in the summer—not in November.) [5]

At the hearing, the court questioned the Debtors' standing to object to the sale because they were the successful bidders. Tr. II at 4. After conceding the Trustee could administer the property if a portion of the stock was nonexempt, the Debtors' attorney argued that the Debtors had the right to raise whether the corporate bylaws had been followed. Tr. II at 4–5. The issue was squarely presented about who might enforce the stock restrictions, the Debtors, the Trustee, shareholders of the corporation (were the Debtors shareholders after they filed their bankruptcy case?), or the corporation itself. Tr. II at 6. The Trustee asserted that the Debtors lacked standing to object because their exemption amount would be paid in full. Tr. II at 7.

After hearing more argument, in great part about the Debtors' ability to object to the sale or not, after they appeared to be willing participants at the sale, the court stated it believed the Debtors' arguments to be "disingenuous." Tr. II at 7–12.[6] *After refusing to withdraw their bid*[7] and

continuing to argue they had standing to object to the sale based upon the stock restrictions, the court ruled the Debtors had "no standing" and that the Trustee possessed the ability to challenge whether stock restrictions were properly followed based upon § 541 of the Bankruptcy Code.[8] Tr. II at 13. The court then orally overruled the Debtors' objection and approved the sale to the Debtors under the "conditions that were noticed out." Tr. II at 14.

In accordance with the oral bench decision by the court rendered on Friday afternoon, November 2, 2007, the Trustee promptly filed a proposed order ("Auction Sale Order") which comported with the court's decision. However, unknown to the court, new storm clouds had gathered and were rapidly approaching. On Wednesday, November 7, 2007, before the court signed and entered the Auction Sale Order, something akin to a legal tornado grazed the Western District of Michigan. Questions still exist whether the legal damage caused is F–0 (light) or F–4 (devastating) on the Fujita Wind Damage Scale. Williams, *The Weather Book*, at 123 (Vintage Books 1992). On November 7, the *Anderson BAP* decision was released.[9]

---

5. Tr. III at 3–4.

6. During the colloquy with the Debtors' attorney, the court candidly remarked: "This is very weird to me that your clients participated in the bidding process, and then they're the successful bidder, and then the sale comes up for approval to your own clients and your clients object." Tr. II at 11.

7. The court would have permitted the Trustee to forthwith sell the stock to TTAP as the second bidder for $46,000.

8. At an earlier point in the hearing, the court stated that it believed the corporation itself might have standing to object to the Trustee's sale. Tr. II at 6. This would be especially true

*if* the Trustee ignored the restrictions when he attempted to sell the stock. The Trustee asserted that he had followed all of the corporation's bylaw restrictions when the sale was conducted. Tr. II at 10. Also, TTAP did not object to the sale and participated in the auction.

9. *Olson v. Anderson (In re Anderson)*, 377 B.R. 865 (6th Cir. BAP 2007) (*"Anderson BAP"*), *rev'g in part, and aff'g in part, In re Anderson*, 357 B.R. 452 (Bankr.W.D.Mich.2006) (*"Anderson Bankruptcy"*), *motion for reconsideration denied*, 357 B.R. 473 (Bankr. W.D.Mich.2006).

After reading the *Anderson BAP* opinion, the court determined this contested matter might necessitate findings of fact regarding what happened, or did not happen, at the auction sale. Also, the court determined that legal memoranda would be helpful given the arguments made at the prior hearing. Therefore, on November 9, 2007, the court issued its Order Scheduling Rehearing on Debtor's Objection to Trustee's Proposed Sale of Stock and Requiring Debtors to File a Legal Memorandum in Support of Objection by Date Certain. Dkt. 48. Requisite issues to be briefed included standing, the conduct of the sale and the requirements, if any, imposed by the corporate bylaws, and whether the Debtors, because they were the successful bidders, were estopped from objecting to the sale.

On November 21, 2007, the Trustee filed his legal memorandum in accordance with the scheduling order. On November 26, 2007, the Debtors untimely filed their legal memorandum.[10] On November 30, 2007,

another hearing took place in the Traverse City courtroom.

At that hearing, the court heard argument from the parties. Four exhibits were admitted into evidence.[11] Although the parties stipulated to many facts, as the court initially suspected, there were some contested facts, most importantly relating to the bidding at the auction sale. Two witnesses testified at the hearing: (1) Michael Cormier, one of the Debtors ("Cormier"); and (2) James W. Boyd, the Trustee. Both witnesses were credible.[12]

Cormier and his wife owned stock in TTAP at the time the bankruptcy petition was filed. Tr. III at 34–35. TTAP received revenues from an oil and gas lease that, after deduction of costs and accounting fees, would be disbursed to the shareholders. *Id.* at 35–36. The Debtors received their monthly distributions, in varying amounts, for approximately ten years before their bankruptcy.[13] *Id.* at

**10.** The late filing has not prejudiced the court in this instance. The Trustee did not assert any prejudice resulting from the Debtors' failure to comply with the court's scheduling order.

**11.** Joint Exhibit 1 is an excerpt of TTAP's Bylaws relating to "Certificate for Shares and Their Transfer" comprised of eight sections. Joint Exhibit 2 is a letter dated June 12, 2007 from TTAP to the Trustee in which TTAP offers to purchase the stock from the estate for $26,826. That letter is signed by "Cameron Cogsdill, President, TTAP Inc." Joint Exhibit 3 is a letter dated October 18, 2007, which states that TTAP "is interested in participating in the bidding process" pursuant to the Trustee's Auction Sale Motion. That letter is also signed by Cameron Cogsdill, as TTAP President.

Debtors' Exhibit A is a document by which "Nancy" faxed to one of the Debtors a copy of a letter, dated June 13, 2007, from the TTAP Board of Directors to the TTAP shareholders, with a form attached, regarding the corporation's possible offer to purchase the stock.

The parties also agreed that the court could listen to a recording of the telephonic auction sale. Tr. III at 11. Although a disc was provided to the court after the hearing was concluded, it was unplayable on the court's equipment. The court has decided, given the testimony at the hearing, that it is not necessary to listen to the recording.

**12.** Cormier's brief testimony is credible only in connection with this contested matter. His testimony and the Debtors' objections raise many questions, all that will be addressed, only if necessary, at a future hearing.

**13.** The Debtors continued to receive monthly distribution checks from the stock after the filing of the case. The issue of whether these funds belong to the Debtors or the estate has been reserved and will be decided by the court in a future proceeding. Tr. III at 14. Presumably, the Debtors will take the position that the postpetition stock distributions constitute "income" that is not property of the estate. Tr. III at 49. The Trustee shall presumably take the position that the stock distri-

36–37. At the time TTAP was formed, each stockholder gave the corporation $10; there never was any "purchase price determined to come up with a value" of the stock. *Id.* at 35 (Cormier's testimony).

After the first meeting when the Trustee was told that the "Mineral Rights" were really a stock interest, the Trustee began investigating to obtain more information. He attempted to obtain financial information from TTAP to determine the estate's interest in the stock based upon a projected income stream. Tr. III at 30. The Trustee and his staff dealt with Cameron Cogsdill, President of TTAP ("Cogsdill"). *Id.* at 30. After many discussions with TTAP, the Trustee received a written offer to purchase the estate's stock. Jt. Exh. 2; Tr. III at 31.

The Trustee then had discussions with the Debtors (apparently through their counsel). The Debtors indicated they wanted to retain the stock and "would bid more." Tr. III at 31; Dkt. 30 ("Sale Motion"). After the Debtors stated they were willing to tender a higher initial offer, the Sale Motion was served upon Cogsdill; he then advised the Trustee that TTAP would participate at the auction sale. Jt. Exh. 3; Tr. III at 31.

The auction sale took place on October 23, 2007. The Trustee, Cormier, and the Debtors' attorney were at one location; Cogsdill was at another location and participated by telephone. Tr. III at 31. Cogsdill, consistently with the prior correspondence sent to the Trustee, stated he would be bidding on behalf of TTAP. *Id.* (Trustee's testimony); Tr. III at 43 (Cormier's testimony). Ultimately, TTAP bid $46,000 and was the second highest bidder. The Debtors were the successful highest bidder at $47,000. Dkt. 37; Confirmation of Auction Sale Motion at 2.

There was at least one other unidentified person in the room with Cogsdill when he appeared telephonically and bid on behalf of the corporation at the auction sale. Tr. III at 43–44. Cormier believed that Cogsdill consulted with other persons before the corporation made its bids. The TTAP Bylaws basically provide that TTAP shall have a right of first refusal regarding the sale of a shareholder's stock interest, Jt. Exh. 1, § 5.1, and that shareholders are given a right of second refusal, Jt. Exh. 1, § 5.2. The auction sale was consistent with the restrictions on transfer contained in the TTAP Bylaws. TTAP made an opening offer, engaged in bidding at the sale, and did not object to the court-approved procedure. Also, shareholders were advised of the sale by TTAP and were given an opportunity to participate to possibly purchase the stock. Tr. III at 41; Debtors' Exh. A. Given the record, the court finds the auction sale and procedures utilized by the Trustee were consistent with the restrictions on transfer and the rights of first refusal and second refusal contained the TTAP Bylaws. Further, given the testimony at the hearing, and the procedures utilized at the auction sale, this court finds the sale was conducted in "good faith" within the meaning of § 363(m). There is no evidence of prohibited self-dealing, collusion, fraud, or other facts that would undercut this finding.

At the hearing, the Debtors' attorney asserted that the Debtors did not intend to hide their ownership of the stock. Tr. III at 7. The Trustee now takes no position and states he has no current knowledge whether the Debtors' nondisclosure was intentional or unintentional. *Id.* During cross-examination, Cormier admitted that he had previously been a debtor in an

---

butions are not income but constitute "[p]roceeds, product, offspring, rents, or profits of or from property of the estate ...." § 541(a)(6).

earlier bankruptcy case. In the prior case, Cormier acknowledged that the Trustee "sold some shares of stock I had in a corporation in Bay City Credit Bureau of Bay City, that my brother was the other stockholder in." Tr. III at 48. The court therefore finds that Cormier knew that the TTAP stock was property of the estate, and might be administered by the Trustee. However, at this stage of the case, it is unnecessary for this court to make any findings of fact regarding the Debtors' good faith, lack of good faith, or possible bad faith.

## V. DISCUSSION

### A. May the Trustee Sell the Stock?

#### 1. Property of the Estate in General.

The Bankruptcy Code provides that the "estate is comprised of all the following property, wherever located and by whomever held: ... all legal or equitable interests of the debtor in property as of the commencement of the case." § 541(a)(1). "Section 541(a)(1) speaks in terms of the debtor's 'interests ... in property,' rather than property in which the debtor has an interest, but this choice of language was not meant to limit the expansive scope of the section." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 8, 103 S.Ct. 2309, 2314, 76 L.Ed.2d 515 (1983) (e.g., the estate includes property in which a creditor holds a security interest); *Johnston v. Hazlett (In re Johnston)*, 209 F.3d 611, 613 (6th Cir.2000) (the estate is very broad and includes all property of the debtor whether exempt or non-exempt).

A debtor's interest in stock of a corporation is property of the estate. *Staats v. Meade (In re Meade)*, 84 B.R. 106, 107 (Bankr.S.D.Ohio 1988) ("Stocks and other forms of securities are regarded by the courts as property of the estate.") (citing

*In re Cumberland Enters., Inc.*, 22 B.R. 626 (Bankr.M.D.Tenn.1982)) (additional citation omitted).

In this case, the Debtors owned the TTAP stock interest when their joint case was filed. Upon filing of the petition, the stock became property of the estate. *Milden v. Joseph (In re Milden)*, 111 F.3d 138, 1997 WL 189302, at *3 (9th Cir. Apr.16, 1997) (unpublished table decision) ("The stock ownership interest in a corporation wholly owned by the debtors becomes property of the estate upon commencement of the case.").

#### 2. Enforceability of Restrictions on Stock Transfer.

As stated by Justice Stevens, except for some specific bankruptcy statutory provisions, "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). Although *Butner* was decided under the old Bankruptcy Act, the statement applies with equal force under the Bankruptcy Code. *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329, 113 S.Ct. 2106, 2110, 124 L.Ed.2d 228 (1993) ("In the absence of a controlling federal rule, we generally assume that Congress has left the determination of property rights in the assets of a bankrupt's estate to state law, since such property interests are created and defined by state law.") (internal quotation marks and alterations omitted); *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 700 (6th Cir.1999) ("[I]t is well-settled that a debtor's property rights are created and defined by state law.").

Under § 541, a trustee only takes the stock interest that a debtor had and takes the stock "subject to the same restrictions that existed at the time the debtor filed the petition." *Demczyk v. Mutual*

*Life Ins. Co. of N.Y. (In re Graham Square, Inc.)*, 126 F.3d 823, 831 (6th Cir. 1997) (debtor's interest in cause of action to recover proceeds from letter of credit was property of the estate); *Strong v. Page (In re Page)*, 239 B.R. 755, 763 (Bankr.W.D.Mich.1999) (examine state law to determine a debtor's interest in property). When a bankruptcy case is filed, the debtor's interest in an asset is not changed; rather, the trustee replaces the debtor to assert the interest. *Matter of Sanders*, 969 F.2d 591, 593 (7th Cir.1992) (A "basic tenet of bankruptcy law [is] that a bankruptcy trustee succeeds only to the title and rights in property that the debtor had at the time she filed the bankruptcy petition."). If the debtor's interest is limited, so is the trustee's. *Id.*

Under the Michigan Business Corporation Act, the "shares of a corporation are personal property." MICH. COMP. LAWS ANN. § 450.1471. As such, the stock is listed as personal property of the Debtors in Schedule B. "A restriction on the transfer ... of a bond or share of a corporation may be imposed by ... the bylaws...." MICH. COMP. LAWS ANN. § 450.1472(1).[14] A permitted restriction includes giving other holders of the stock a prior opportunity to buy the stock before it is sold to another, i.e., a right of first refusal. MICH. COMP. LAWS ANN. § 450.1473. In accordance with Michigan corporation law, the TTAP By-laws gave a right of first refusal to the corporation and a right of second refusal to the other shareholders. Jt. Exh. 1.

The Debtors, in a somewhat garbled argument, state that they may bring a direct action "to establish the acts of the directors or those in control of the corpo-ration are illegal, fraudulent, or willfully unfair and oppressive to the corporation or to the shareholder." MICH. COMP. LAWS ANN. § 450.1489. Presumably, based upon the Debtors' legal memorandum, and the testimony of Cormier, the Debtors believe that TTAP acted improperly in bidding for the stock at the auction sale. The gist of the complaint seems to be that TTAP, by bidding, caused the Debtors to have to pay "$20,000 more to bid against somebody who shouldn't have been bidding in the first place because the stock restrictions were not met." Tr. II at 3–4; *see also* Tr. II at 7 ("it cost the [D]ebtors an additional $20,000 to retain the stock"). Therefore, the Debtors wanted "the court to actually hold a hearing and determine whether or not the stock restrictions had been met to a point where there was no authorization to sell." *Id.* at 4. This court rejects the Debtors' argument.

▮ First, when the bankruptcy case was filed, the stock became property of the estate subject to sale by the Trustee. §§ 541 and 363(b)(1). By operation of law, the Trustee became the "shareholder" of the corporation and possessed all of the Debtors' rights in the stock under state law. *Calvert v. Bongards Creameries (In re Schauer)*, 835 F.2d 1222, 1225 (8th Cir. 1987) (trustee only takes rights the debtor had under state law); *In re Six*, 190 B.R. 958, 961 (Bankr.M.D.Fla.1995) ("the trustee of the estate succeeds to the rights of a Debtor and his rights are not greater nor less than what were the rights of a Debtor prior to the commencement of a case"). One of the rights that the Trustee took, as the shareholder, was the ability to institute

---

14. A written restriction on transfer of the stock must be "noted conspicuously" on the stock. MICH. COMP. LAWS ANN. § 450.1472(2). Whether this requisite notation appeared on the TTAP stock is unknown. However, for purposes of this opinion, it is assumed the notation was on the stock held by the Debtors at the time of the bankruptcy filing. As discussed in this opinion, regardless of whether the notation was properly made or not, the outcome is unchanged.

legal action against the corporation. MICH. COMP. LAWS ANN. § 450.1489(1); ("A shareholder may bring an action. . . ."); *Honigman v. Comerica Bank (In re Van Dresser Corp.)*, 128 F.3d 945, 947 (6th Cir.1997) ("A debtor's appointed trustee has the *exclusive* right to assert the debtor's claim.") (emphasis in original); *Cottrell v. Schilling (In re Cottrell)*, 876 F.2d 540, 543 (6th Cir.1989) (the debtors' personal injury action was property of estate and it was proper to substitute the trustee's attorney as counsel of record). The Debtors, upon their bankruptcy filing, lost any cause of action they might have asserted in their capacity as a TTAP shareholder. *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir.1988) (property of estate includes causes of action; a "debtor has no standing to pursue such causes of action") (citing *Matter of Tvorik*, 83 B.R. 450, 456 (Bankr. W.D.Mich.1988)). Therefore, even assuming that TTAP may have acted improperly during the bidding process, the right to contest the bidding belongs to the trustee, as the shareholder, and not the Debtors.

■ Second, the Debtors gripe because they assert they lack information about TTAP's involvement in the bidding at the sale and believe the stock restrictions were not met. Tr. II at 3–4; Tr. III at 8. Because TTAP did not tell the Debtors about its intention to buy the stock, the Debtors object. TTAP's Bylaws require that the selling shareholder give notice and that the corporation be provided a right of first refusal and the other shareholders be afforded a right of second refusal. "[T]he notice requirement is to protect the shareholders, not the seller." *Blackwell v. Lurie (In re Popkin & Stern)*, 238 B.R. 146, 150 (8th Cir. BAP 1999) (case involved a chapter 11 trustee who became a liquidating trustee and sought to collect a judgment by selling the judgment-debtor's stock), *aff'd*, 242 F.3d 376, 2000 WL

1597837 (8th Cir. Oct.27, 2000) (unpublished table decision) (rejecting the debtor's argument that *he* was the only person who could give the prescribed notice of intent to transfer stock; the court affirmed that the debtor lacked standing to raise the argument).

When the court approved the Trustee's Sale Motion, the court approved bidding procedures for the auction sale. Dkt. 30. At that time, the Debtors had "no objection for the court order to be entered." Tr. I at 3. Only later, after the Debtors were "forced" to make the highest bid of $47,000, did they object. Tr. II at 3 and 7. The Debtors argue that this higher bid manufactured standing for them to object. Tr. II at 7.

■ "The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr.E.D.Pa.1998). "Finality and regularity of proceedings are significant factors whenever the courts are involved in a sale of property, for devotion to those principles encourages fervent bidding and' ensures that interested parties will sincerely extend their best and highest offers at the auction itself." *Id.* (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564–65 (8th Cir.1997)). An auction sale should be conducted "in compliance with the bidder's reasonable expectations." *Id.* at 562. This court, in deciding this contested matter, should be mindful to "strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets." *Id.*

The bidding procedures sought by the Trustee, and approved by this court, met all the relevant goals to achieve a valid and binding sale. TTAP made an initial offer. The Debtors were permitted to credit bid their claimed exempt amount in the stock.

The Debtors then made a higher initial offer. An auction sale was scheduled at a convenient time for the Debtors and TTAP. The other shareholders of TTAP were advised of the sale. TTAP and the shareholders did not object to the bidding procedures. The Debtors were given notice of the auction procedures and also participated. TTAP, and perhaps its other shareholders, also participated. The sale procedures utilized also met the TTAP Bylaws to give that corporation and its shareholders their respective rights of first and second refusal. Even assuming the Debtors held some sort of a remnant right as a TTAP shareholder, any such right was not compromised or extinguished by the sale procedures approved by the court. The Debtors' miasmatic objection to the sale procedures is overruled.

### B. Is the Stock Partially Exempt or Wholly Exempt?

▮ If the stock interest is partially exempt, it may be sold by the Trustee, § 363(b), and the Debtors will be paid their claimed exemption amount, § 522(b), (d)(5), and (l). The balance of the sale proceeds will then be distributed to creditors. § 726. However, if the stock has been exempted "in kind" and is fully exempt, the stock is arguably removed from the estate and may not be sold by the trustee. Under this result, the Debtors keep the stock and creditors receive nothing. This is the paramount issue that requires a careful statutory analysis, a review of Bankruptcy Rule 4003 and the Official Forms, and some consideration of bankruptcy policy.

### 1. Taylor v. Freeland & Kronz: What it Says and What it Doesn't Say.

The *Anderson Bankruptcy* and *Anderson BAP* opinions rely extensively upon language from *Taylor v. Freeland & Kronz*, 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992) (herein *"Taylor"*).[15] This court needs to first examine the *Taylor* decision to see what the Court decided in its holding and what other language is merely explanatory. To do so, it is helpful to revisit the decisional history of *Taylor*.

In *Taylor's* lower court proceeding, the bankruptcy court faced a postpetition transfer avoidance action. *Taylor v. Freeland & Kronz (In re Davis)*, 105 B.R. 288 (Bankr.W.D.Pa.1989). At trial, that court heard testimony and reviewed the exhibits. The court found that the debtor "claimed the proceeds of the cause of action as exempt on Schedule B–4[16] pursuant to 11 U.S.C. §§ 522(b) and (d) and listed its value as 'unknown.'" *Id.* at 291. Were the proceeds from the litigation recovery property of the estate in the debtor's bankruptcy case? Or were the proceeds removed from the estate because of the debtor's claimed exemption? The debtor listed the proceeds as exempt with an "unknown" value on her schedules. The trustee did not object to the claimed exemption. In its analysis, the bankruptcy court, noting a difference of opinion, basically decided that an exemption must be statutorily valid for the property to be removed from the estate under § 522(l). There was no issue about whether the litigation proceeds were "claimed as exempt" within the meaning of § 522(l). There were no findings, discussion, or analysis regarding any

---

**15.** As of February 11, 2008, according to Westlaw's "Citing References," *Taylor* has been cited in nearly 1,700 documents.

**16.** When the *Taylor* case began its climb through the appellate ladder a debtor's ex-

emptions were listed on Schedule B–4. The relevant Official Form, discussed below, now requires that exemptions be listed on Schedule C.

intent to claim an "in kind" exemption by Davis, the debtor.

On appeal, the district court affirmed. *Taylor v. Freeland & Kronz (In re Davis)*, 118 B.R. 272 (W.D.Pa.1990). The record on appeal also established that there was no controversy about whether the debtor entirely exempted the litigation proceeds. "The debtor also claimed the proceeds of the cause of action as exempt on Schedule B–4 pursuant to 11 U.S.C. §§ 522(b) and (d), and listed its value as unknown." *Id.* at 274. Again, at the district court appellate level, there was no question whether the property was "claimed as exempt" under § 522(*l*).

On further appeal, the Court of Appeals for the Third Circuit reversed the district court. *Taylor v. Freeland & Kronz*, 938 F.2d 420 (3d Cir.1991). In the introduction to the opinion, the Third Circuit stated: "Section 522(*l*) requires that a trustee or other party in interest file with the bankruptcy court any objections to property exemptions claimed by the debtor. In the absence of a filed objection, the property claimed exempt by the debtor is exempt." *Id.* at 421. Again, there was no dispute that the debtor had claimed the entire proceeds as exempt. "On Schedule B–4, on which a debtor claims property as exempt, [the debtor] again identified the potential proceeds of the ... lawsuit and listed the value as 'unknown.'" *Id.*

The issue on appeal focused solely on the correct legal interpretation of § 522 (*l*). The Third Circuit identified the three then-current statutory interpretations. One view was that "claimed exempt," without a timely objection, means the exemption is valid. A second view was that § 522(*l*) is constrained by § 522(b) and therefore requires a claimed exemption be legally valid. Under this interpretation, if there was no statutory basis for the claimed exemption, an objection is not nec-

essary. The third approach was that a court should examine the claimed exemption, even absent a timely objection, to assess whether a "good faith statutory basis" exists for the claimed exemption. *See Munoz v. Dembs (Matter of Dembs)*, 757 F.2d 777, 780 (6th Cir.1985) (adopting this third approach); *accord In re Peterson*, 920 F.2d 1389, 1393 (8th Cir.1990) (a court should examine the claimed exemption to see if it was filed in good faith).

In *Taylor*, the Third Circuit held the first literal interpretation was legally correct. "Absent a timely filed objection, the property claimed by a debtor as exempt under section 522 of the Bankruptcy Code is exempt." *Taylor*, 938 F.2d at 426. There is no discussion or analysis by the Third Circuit about whether the property was claimed exempt and about how an "in kind" exemption is to be claimed by a particular debtor.

Because of the difference of opinion between the Circuits, the Supreme Court decided *Taylor*. The Court framed the issue as "whether the trustee may contest the validity of an exemption after the 30–day period [established by Bankruptcy Rule 4003] if the debtor had no colorable basis for claiming the exemption." *Taylor*, 503 U.S. at 639, 112 S.Ct. at 1646. The Supreme Court affirmed the Third Circuit's decision. In reciting the background of the case, Justice Thomas stated: "On a schedule filed with the Bankruptcy Court, Davis [the debtor] claimed as exempt property the money that she expected to win in her discrimination suit against TWA. She described this property as 'Proceeds from lawsuit—[Davis] v. TWA' and 'Claim for lost wages' and listed its value as 'unknown.'" *Taylor*, 503 U.S. at 640, 112 S.Ct. at 1646. The Court later stated, notwithstanding that Davis "did not have a right to exempt more than a small portion of these proceeds," she "in fact claimed the

full amount as exempt." *Taylor,* 503 U.S. at 642, 112 S.Ct. at 1647.

■ The issue that the Court decided is narrow. "We hold, however, that [the trustee's] failure to [object to the claimed exemption] prevents him from challenging the validity of the exemption now." *Taylor,* 503 U.S. at 642, 112 S.Ct. at 1648. It was taken as a given that the debtor had claimed the lawsuit proceeds exempt in their entirety. "Davis claimed the lawsuit proceeds as exempt on a list filed with the Bankruptcy Court." *Taylor,* 503 U.S. at 643, 112 S.Ct. at 1648. The Court's holding is premised on Bankruptcy Rule 4003(b), resulting in the often quoted language that "[d]eadlines may lead to unwelcomed results, but they prompt parties to act and they produce finality." *Taylor,* 503 U.S. at 644, 112 S.Ct. at 1648. The unstated premise in *Taylor* is limited: when a debtor claims property as fully exempt, and no objection is timely filed, the property is exempt. However, other than this premise, the Supreme Court was not called upon to interpret the exemption statute, including § 522(d), nor did it even discuss it, except perhaps in passing.[17] In *Taylor* there is no statutory analysis, much less any holding, about what property is "claimed exempt" and *how* a debtor may claim an "in kind" exemption to assert the entire property as exempt.[18] To analyze how an exemption is claimed, one must start with the statute itself.

## 2. The Exemption Statute, § 522.

The Bankruptcy Code permits a debtor to exempt property under the federal exemptions or under applicable state (and nonbankruptcy federal) exemptions, unless a particular state has chosen to opt-out from the federal bankruptcy exemptions. § 522(b)(1), (2) and (3). Michigan has not opted out and permits election of the federal exemptions in § 522(d). In both this case, and in the *Anderson* case, the respective debtors claimed their exemptions under the "catchall" exemption contained in § 522(d)(5). In both cases, the real issue is "what did the debtor claim as exempt?"[19] Only after this question is answered may one determine what "is exempt." § 522(*l*).

The bankruptcy court in *In re Anderson,* 357 B.R. 452 (Bankr.W.D.Mich. 2006) ("*Anderson Bankruptcy*"), *rev'd in part, aff'd in part,* 377 B.R. 865 (6th Cir. BAP 2007), without adequate statutory analysis, imposed a judge-invented mechanical formula to determinate what is "claimed as exempt," relying in part upon a debtor's scheduled values. The judge-made formula goes like this: "if the value (net of liens) in Schedule C given for the property is equal or less than the value of the exemptions claimed, then the trustee must *presume* that the debtor intends the exemption claimed to be taken in-kind." *Anderson Bankruptcy,* 357 B.R. at 471

---

17. The entire discussion by the Court of the issue revolves around § 522(*l*) and Bankruptcy Rule 4003.

18. A careful reading of *Taylor* leads to only one conclusion about property "claimed as exempt"—when a lawsuit is listed as "unknown," the exemption claim is for all the proceeds.

19. The *Anderson BAP* says the "overarching" issue on appeal is whether the *Anderson* bankruptcy court abused its discretion "by applying an erroneous legal standard." *Anderson,* 377 B.R. at 868. The BAP further states that the "underlying" issue is whether the trustee's failure to object to an exemption "removed the property in its entirety from the bankruptcy estate." *Id.* The real issue that first must be addressed is "what did the debtor actually exempt" or, stated differently in accordance with the language of § 522(*l*), what property was "claimed as exempt?"

(emphasis supplied).[20] The flip side of this presumed mechanical formula is that "[i]f the value (net of liens) given for the property is greater than the value of the exemption claimed, the property remains property of the estate." *Id.* Based upon scheduled value alone, in the first instance a trustee must object. But in the second instance, no objection is necessary. Is this the law?[21]

■ *Statutory interpretation.* "When a federal court is required to interpret a statute enacted by Congress, such as the Bankruptcy Code, the Supreme Court has clearly and repeatedly underscored the court's obligation. 'In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress.'" Kenneth N. Klee & Frank A. Merola, *Ignoring Congressional Intent: Eight Years of Judicial Legislation,* 62 Am. Bankr.L.J. 1 (Winter 1988) (quoting *United States v. Am. Trucking Ass'ns,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940)). When interpreting a federal statute, such as § 522 of the Bankruptcy Code in this contested matter, this court

has no power to change Congress' policy. *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 215, 82 S.Ct. 1328, 1339, 8 L.Ed.2d 440 (1962) ("Where congressional intent is discernable . . . we must give effect to that intent."), *overruled on other grounds by Boys Mkts., Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

"[A]n individual debtor may exempt from property of the estate the property listed in . . . paragraph (2) . . . of this subsection." § 522(b)(1). "Paragraph (2)" permits exemption of "property that is specified under subsection (d)," i.e., the list contained in § 522(d). That subsection states in pertinent part:

The following property may be exempted under subsection (b)(2) of this section:

(5) The debtor's aggregate interest in any property, not to exceed in value $975 plus up to $9,250 of any unused amount of the exemption provided under paragraph (1) of this subsection.

§ 522(d)(5) (the "catchall exemption").[22]

Because the Debtors filed a joint case,

---

**20.** Although the exemption statute will be construed later, a minor point must be made. There is no "presumption" set forth anywhere in § 522. If Congress wanted a presumption regarding a debtor's claim of exemptions, it knows how to do so. *See, e.g.,* § 547(f) (presumption of insolvency).

**21.** There exists an apparent troublesome disconnect when one considers both of these formulas in tandem. In the first formula, the debtor's scheduled value is binding on the estate. Hence, when the asset is valued at $50,000, a lien is scheduled for $30,000, and the exemption is claimed in a legally proper amount of $20,000, absent an objection to the exemption, the property is removed from the estate. The formula presumes that the value is binding (and the scheduled lien amount is also correct). However, the companion formula does not contemplate that the scheduled value is binding. Hence, in the second for-

mula, when the asset is valued at $50,000, a lien is scheduled for $29,000, and the exemption is claimed in a legally proper amount of $20,000, there exists $1,000 in nonexempt equity for the estate. If the value (and the scheduled lien amount) is binding in this formula, will the estate be limited to keeping $1,000 even if the property was sold for, say, $80,000? If the scheduled value is binding under the first formula, is there any principled reason to say the value is not binding under the second formula? Logically, should not the asserted scheduled value be irrelevant in both instances? Also, what about the scheduled lien? Is it likewise binding unless the lien amount is timely objected to by a trustee? What about the role, if any, of Bankruptcy Rule 3012?

**22.** Although not relevant to this case, the exemption amounts in § 522(d)(5) were increased on April 1, 2007 to "$1,075 plus up to

they each were entitled to claim exemptions under § 522(d)(5). Michael Cormier claimed the stock as exempt in the amount of $9,650. His spouse, Linda Cormier, claimed the stock as exempt in the amount of $4,500. The total claimed exempt amount is $14,150. On Schedule C, the stock is listed as having a value of $1.00.

In accordance with the *Anderson Bankruptcy* judge-invented mechanical formula, the exemption claimed in the stock is in excess of the scheduled value. Because the Trustee failed to object to the exemption in this case, the *Anderson Bankruptcy* opinion would result in the stock being removed from the estate. Trustee Boyd would be prohibited from selling the stock.[23]

■■■■ "We have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Stated differently but more directly—"When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank*, 503 U.S. at 254, 112 S.Ct. at 1149 (quoting *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)). "[A]s long as the [Bankruptcy Code] is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240–

41, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).

■■■■ This court believes that § 522(d)(5) is direct and unambiguous. An individual debtor may exempt his or her interest in any property not to exceed a value of a maximum specific amount. Interpreting the statute as an "in-kind" exemption does not give enough weight to the language "not to exceed in value." It is a "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992). The *Anderson Bankruptcy* opinion presumed exemption formula violates this rule of construction and fails to give "significance and effect ... to every word." *Rake v. Wade*, 508 U.S. 464, 471, 113 S.Ct. 2187, 2194, 124 L.Ed.2d 424 (1993) (citation and internal quotation marks omitted).

■■■■ To discern the importance of § 522(d)(5), it is worthwhile to quickly review § 522(d) in its entirety. Of its twelve subsections, only eight have a reference to a maximum monetary amount.[24] The four other subsections have no monetary limitation.[25] The exemptions without the monetary limitations might appropriately be described as "in-kind" exemptions. For purposes of construing § 522(d)(5), the comparison demonstrates that Congress treated different exemption subsections in different ways.[26] It is "generally

---

$10,125 of any unused amounts" of § 522(d)(1).

**23.** As stated by the *Anderson Bankruptcy* opinion, Trustee Boyd in this case should have known the *"debtors' true intentions"* when the Debtors Cormier claimed the stock as exempt. *Anderson Bankruptcy*, 357 B.R. at 461 (italics supplied).

**24.** The eight subsections are: § 522(d)(1), (2), (3), (4), (5), (6), (8), and a subpart of (11).

**25.** The four subsections are § 522(d)(7), (9), (10) and (12). In addition, four of the five subparts of § 522(d)(11) have no monetary limitation.

**26.** Also, it might be noted here that some of the exemption subsections are circumscribed by need rather than by a specific monetary

presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another...." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114 S.Ct. 1757, 1761, 128 L.Ed.2d 556 (1994) (quoting *City of Chicago v. Envtl. Defense Fund*, 511 U.S. 328, 338, 114 S.Ct. 1588, 1593, 128 L.Ed.2d 302 (1994) (internal quotation marks omitted)). The language of § 522(d)(5), contrasted with the "in-kind" exemption subsections, encourages a reader to conclude that a difference must exist—the maximum stated amount must mean *something*. As noted above, the statute says *nothing* about a debtor's scheduled value begetting an unassailable in-kind exemption.

■ "One more caution is relevant when one is admonished to listen attentively to what a statute says. One must also listen attentively to what it does not say." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L.Rev. 527, 536 (1947). Based upon the explicit statutory language and the melange of interpretation principles, this court believes that § 522(d)(5) does not contemplate any "in-kind" exemption.

*The role of the Bankruptcy Rules.* Do the Bankruptcy Rules affect this outcome? "The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under [the Bankruptcy Code]. Such rules shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2075.

[Bankruptcy] Rule 4003, which is derived from § 522(*l*) of the [Bankruptcy] Code and in part from former Bankruptcy Rule 403, shifted the emphasis of the earlier Rule, placing the burden on the debtor to list her exemptions and the burden on the parties in interest to raise objections. Rule 4003(b) in particular fills a gap that remains in § 522(*l*), which is silent as to the time in which parties in interest must file their objections. Rule 4003(b) provides for a 30-day period for objections. Although the adoption of Rule 4003 has furthered the interest in orderly administration, there is no suggestion that it was put into effect in order to avoid prejudice to the debtor.

*Taylor*, 503 U.S. 638, 646–47, 112 S.Ct. 1644, 1650, 118 L.Ed.2d 280 (Stevens, J., dissenting); *see also* FED. R. BANKR.P. 4003 advisory committee's note.

Bankruptcy Rule 9009 mandates that "Official Forms" shall be "used with alterations as may be appropriate." FED. R. BANKR.P. 9009. "The forms shall be construed to be consistent with these rules and the [Bankruptcy] Code." *Id.* The obligation to use the Official Forms is to facilitate the processing of bankruptcy paperwork for administration. FED. R. BANKR.P. 9009 advisory committee's note. The Official Forms, as creatures of the Bankruptcy Rules, also must be construed in accordance with the substantive rights established by the Bankruptcy Code. 28 U.S.C. § 2075.

Official Form 6 encompasses all of the Bankruptcy Schedules. Official Form 6C, "Schedule C," is the current form utilized to designate "Property Claimed as Exempt." Schedule C first requires a debtor to check a box to choose federal exemptions under § 522(b)(2) (if the state has not "opted out") or state and federal nonbankruptcy exemptions under § 522(b)(3). Then Schedule C contains four columns to

amount. § 522(d)(10)(D), (E); § 522(d)(11)(B), (C), and (E) (all which state "to the extent reasonably necessary for the support of the debtor and any dependent of the debtor").

insert information relating to a debtor's exemptions. Column 1 requires a "Description of Property." This tracks § 522(b)(2) and (d) so the debtors, creditors, trustee and the court will know what property is exempt. Column 2 entitled "Specify Law Providing Each Exemption" requires the debtor to state the statutory basis to establish that the property identified may be exempted. For example, in both *Anderson* and this case, the law cited is "§ 522(d)(5)," the catchall. The column is necessary to identify the specific federal exemption. § 522(d) ("The following property may be exempted...."). The third column requires information regarding the "Value of [the] Claimed Exemption." In some instances, including where a § 522(d)(5) exemption is claimed, this information is necessary to determine the property claimed exempt because a maximum amount is stated in the statute. In other instances, the column may be left blank because the subsection under which the exemption is claimed is not subject to a maximum amount. *See* n. 25 *supra*. Only in those subsections that lack a maximum amount does the statute contemplate an "in-kind" or full exemption.

The fourth column requires the debtor to state "Current Value of Property Without Deducting Exemption." This information is *not* required by § 522. This court believes the total value of the property, in Column 4, as contrasted to the value (amount) claimed as exempt in Column 3, is likely included for the administrative convenience of the parties in interest. By comparing the figures in Column 3 and Column 4, one can easily see whether (according to the debtor's value estimation) the property may be administered for the benefit of the estate. A reader of the Schedules is not then required to revert to Schedule A (Real Property) or Schedule B (Personal Property)[27] to review the estimated scheduled values. (Of course, if the Schedules are properly prepared, the current values respecting any particular described property should be identical).[28]

The current value "bonus information" in Column 4 of Schedule C may not be used, and should not be used, to determine "the property claimed as exempt" for purposes of § 522(*l*). The claimed exemption is determined exclusively by the first column, the second column and, only when necessary, the third column.

Any analysis using the information in Column 4 to create an "in-kind" formula, such as developed in the *Anderson Bankruptcy* opinion, is incorrect. The *procedures* required by the Bankruptcy Rules and the Official Forms cannot, and should not, be utilized to modify the *substantive* law mandated by the Bankruptcy Code. Therefore, on this basis as well, the *Anderson Bankruptcy* mechanical formula invented to establish a presumed claimed in-kind exemption fails.

 *Bankruptcy policy.* Some comments about bankruptcy policy are appropriate. "In determining the meaning of a statute, we look not only to the particular statutory language but to the design of the statute as a whole and to its object and policy." *Grogan v. Garner,* 498 U.S. 279, 288, 111 S.Ct. 654, 660 n. 13, 112 L.Ed.2d 755 (quoting *Crandon v. United States,*

---

**27.** It should also be recognized that, consistent with § 522(d)(5), the instructions to complete Schedule B state: "If the debtor is an individual or a joint petition is filed, *state the amount of any exemption claimed* only in Schedule C̄Property Claimed as Exempt." (Emphasis supplied.)

**28.** In accordance with the Bankruptcy Code, the current "value" listed should be the "fair market value as of the date of the filing of the petition." § 522(a)(2).

494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990)). "Exemptions, both under state and federal bankruptcy laws, have generally been recognized as necessary in order to preserve the debtor's access to property that is essential to 'life and livelihood,' and to shift the burden of support for the debtor and the debtor's dependents from the public to private credit sources." William Houston Brown, *Political and Ethical Considerations of Exemption Limitations: The "Opt–Out" as Child of the First and Parent of the Second,* 71 Am. Bankr.L.J. 149, 163 (Spring 1997) (herein "Brown"). One well worn but still valid phrase is that an "honest debtor" should "start afresh free from obligations." *Local Loan v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). The old Bankruptcy Act "gives the honest but unfortunate debtor *who surrenders for distribution the property which he owns at the time of bankruptcy,* a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Id.* (emphasis supplied). This remains equally true under the current Bankruptcy Code. *Central Virginia Cmty. Coll. v. Katz,* 546 U.S. 356, 363–64, 126 S.Ct. 990, 997, 163 L.Ed.2d 945 (2006) (one of the "[c]ritical features of every bankruptcy proceeding [is] ... the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts"). A countervailing principle exists—a debtor should keep only that which is legally deserved—a debtor is not entitled to a "head start." *Lines v. Frederick,* 400 U.S. 18, 21, 91 S.Ct. 113, 115, 27 L.Ed.2d 124 (1970) (Harlan, J., dissenting).

In an attempt to originate its own preferred policy, the *Anderson Bankruptcy* court generates hypothetical questions and then answers those questions to its liking. "[D]ebtors prefer to keep as exempt whatever they currently own so as to make their fresh start as seamless as possible. Section 522 itself reflects this preference, for subsection (b) speaks of exempting *property* not *values." Anderson Bankruptcy,* 357 B.R. at 464 (emphasis in original). Statements such as this, with undue emphasis on particular words, does not a valid policy make. Sure, it would be nice to gift a debtor all of his or her prepetition property as part of the fresh start. However, the *amount* of exemptions permitted are Congressionally determined, in part, by the tension between a debtor's remedies and his creditors' rights. *See generally Brown,* 71 Am. Bankr.L.J. at 168 (noting the balance between "competing debtor and creditor interests").

The Bankruptcy Code and the underlying policy gives debtors a method by which they may keep all (or most all) of their prepetition property. The method is called "Chapter 13."

> As to individual, primarily consumer debtors, the Code encouraged greater use of Chapter 13, the former wage earner chapter. The congressional encouragement of Chapter 13, with its attendant enhanced discharge, was a significant political decision designed to influence an individual debtor's choices between concern for retention of exempt property in a Chapter 7 liquidation or retention of both exempt and nonexempt property in an adjustment of debt chapter.

*Brown,* 71 Am. Bankr.L.J. at 160–61.

The Sixth Circuit has also stated the difference between the various bankruptcy chapters.

> A fresh start is afforded through discharge of all or a portion of his debts. *Chapter 7 of the Bankruptcy Code allows discharge in exchange for liquidation of the debtor's assets for the ben-*

*efit of his creditors,* and Chapter 11 permits a debtor to rehabilitate his business and discharge debts by reorganizing, conducting his affairs, and paying creditors, in accordance with a court-approved plan, while under Chapter 13 a debtor may adjust the amount of his unsecured debts in exchange for dedicating to creditors a portion of his future income.

*In re Krohn,* 886 F.2d 123, 125 (6th Cir. 1989) (emphasis added). The policy preference in a chapter 7 is that a debtor's property may be liquidated so creditors will receive some repayment of their allowed claims. Construing chapter 7 to permit a debtor to retain property in excess of the maximum amount permitted by § 522(d)(5) turns the Bankruptcy Code upside down.

Another policy consideration is implicit in construing the issue of "what property does a debtor claim as exempt?" What is to be done when a debtor's declared exemption is ambiguous?

This court previously considered the import of the *Taylor* decision and "practical policy considerations." *Matter of Heflin,* 215 B.R. 530, 535 (Bankr.W.D.Mich.1997). In that case, this judge stated:

> If a debtor intends to fully exempt a particular piece of property in its entirety, regardless of its value, then the debtor should unambiguously express this intention in his schedules. Where the debtor makes a clear manifestation of his intent to seek an unlimited exemption in a specific piece of property, then

the trustee has ample notice and can either file an objection or seek an extension of time in which to conduct further investigation. If the trustee fails to object, or fails to obtain a timely extension, then the trustee cannot subsequently challenge the validity of the exemption.

*Heflin,* 215 B.R. at 536 (citing *Taylor,* 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280).[29]

To say the *Anderson Bankruptcy* court disagrees with the *Heflin* analysis is an understatement. The *Anderson Bankruptcy* court rejects any "magic language" that results from the "idiosyncrasies of that particular court." *Anderson Bankruptcy,* 357 B.R. at 463. Characterizing the *Heflin* debtor's claimed exemption as "at most" being "ambiguous," the *Anderson Bankruptcy* court maintains that the trustee has the burden "to easily eliminate whatever ambiguity there may be concerning the debtor's intention to take an in-kind exemption." *Anderson Bankruptcy,* 357 B.R. at 463 & n. 15. Further, why "place the burden upon the debtor to clear up the ambiguity at some later date through an amendment to his schedules?" *Id.* at 463.

Who created the ambiguity—the debtor or the trustee? What common sense is there, as bankruptcy policy, to require a trustee to affirmatively clear up any (or all) ambiguities that debtors may state in their Schedules? Should not the debtor bear the burden to clarify the ambiguity that he created?[30]

---

**29.** A pinpoint cite to *Taylor* in *Heflin* may have been helpful. *See Taylor,* 503 U.S. 638, 640, 112 S.Ct. 1644, 1647, 118 L.Ed.2d 280 ("[The debtor] in fact claimed the full amount as exempt.") The Supreme Court found nothing ambiguous in the exemption claimed that was before it. Therefore, what might occur when an ambiguous exemption claim was list-

ed was not discussed, or even considered, by the Court.

**30.** In contract law, ambiguities are often construed against the drafter or parol evidence is admissible to discover the intent of the contracting parties. *See NILAC Int'l Mktg. Group v. Ameritech Servs., Inc.,* 362 F.3d 354, 359 (6th Cir.2004) (Under Michigan law, if the

The First Circuit Court of Appeals, in an opinion authored by former Chief Judge Conrad Cyr, a former bankruptcy judge and renowned jurist, has written about an ambiguous declaration of exemptions by a debtor. *Mercer v. Monzack*, 53 F.3d 1 (1st Cir.1995). *Mercer* identified the threshold question of "whether the property in dispute is *in fact* the property of the estate listed as exempt." *Mercer*, 53 F.3d. at 3 (emphasis in original). Judge Cyr stated that "[n]othing in *Taylor* intimates that 'property of the estate' *not* plainly listed in Schedule B–4 nonetheless *becomes exempt* by operation of law under section 522(*l*)" *Id.* (emphasis in original). This court believes that *Mercer* stands for the proposition that an ambiguous assertion of an exemption is insufficient to claim property of the estate as exempt and therefore such property does not become "exempt by operation of law under section 522(*l*)" *Mercer*, 53 F.3d at 3.

■ One other minor bankruptcy policy needs to be very briefly addressed. In interpreting a Bankruptcy Code provision, Justice Thomas says it is not improper to consider administration of the law. *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 331, 113 S.Ct. 2106, 2111, 124 L.Ed.2d 228 (1993) (recognizing that one interpretation of § 1322(b) "is the more reasonable one, since we cannot discern how [the statute] could be administered under [the other] interpretation").

■ As pointed out by Justice Stevens in *Taylor*:

> Bankruptcy courts would understandably be reluctant to encourage a policy that would contribute to the overburdening of the bankruptcy court system. As counsel for the trustee explained: "Last year [1991] there were 880,000 bankruptcy filings, 291 bankruptcy judges to deal with all of those filings, and a real need on the part of the bankruptcy courts to rely on the good faith of debtors in claiming exemptions, otherwise the whole system would collapse."

*Taylor*, 503 U.S. at 649 n. 4, 112 S.Ct. at 1651 (Stevens, J. dissenting). In this case, as well as the *Anderson* case, and all other individual chapter 7 bankruptcy cases for that matter, there is a "real need" for the parties in interest and the courts to rely on debtors *unambiguously* stating what property they claim as exempt. In case administration, a trustee should not "be placed in the untenable position of having to 'object first and ask questions later' in every case where the claimed exemption exceeded the estimated fair market value minus secured claims." *Heflin*, 215 B.R. at 535. Such an interpretation will adversely affect case administration and result in unnecessary objections, with attendant wasteful expense and undue delay for both debtors and the appointed trustees.[31]

finder of fact determines that the language of a contract is ambiguous, extrinsic evidence may be used to determine the intended meaning of the ambiguous language. "If, after a review of the relevant extrinsic evidence, the factfinder remains unable to determine the intent of the parties, the ambiguities are to be construed against the drafter of the contract.") (citing *Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459, 663 N.W.2d 447, 454 (2003)); *Walkington v. Prod. Credit Ass'n (In re Walkington)*, 42 B.R. 67, 71 (Bankr. W.D.Mich.1984) ("[I]t is a fundamental principle of construction that documents are con-

strued against their drafter."). Should this treatment be used in bankruptcy law policy as well? It would seem so to this judge.

**31.** If Bankruptcy Rule 4003, coupled with *Taylor*, is construed to require a trustee to object to scheduled values asserted by a debtor in Schedule C, violence is done to the Bankruptcy Code *and* the Rules. A judge-imposed requirement may result in thousands of otherwise unnecessary objections to exemptions. Some trustees may feel compelled to object to exemptions when it is then impossible to determine the actual *value* of proper-

## C. The Anderson BAP Opinion: Broadly or Narrowly Construed?

The *Anderson BAP* opinion addressed two main issues. First, did the *Anderson Bankruptcy* court utilize the proper law to review a proposed settlement? Second, was the lower court correct in its determination that the property was no longer property of the estate? These issues will be discussed in turn.

### 1. The Legally Proper Settlement Standard.

The *Anderson Bankruptcy* opinion relied upon its own special brand of settlement standards created by *In re Dalen*, 259 B.R. 586 (Bankr.W.D.Mich.2001).

According to *Dalen*, "the ultimate question raised in a hearing concerning court approval of a trustee's proposed settlement is whether the trustee, in reaching that settlement, has complied with her fiduciary duties [of care, loyalty, and obedience] to the bankruptcy estate, its creditors, and other parties in interest." This fiduciary standard purportedly is derived from "a well developed body of Sixth Circuit case law concerning the process by which a court is to approve consent decrees," and, according to the bankruptcy court, "offer[s] considerable assistance in determining how a bankruptcy court should evaluate a settlement agreement which has been presented to it by a trustee for approval." *Anderson BAP*, 377 B.R. at 871–72 (discussing and quoting *Dalen*, 259 B.R. at 604, 611) (internal citation and footnotes omitted).

The BAP rejected *Dalen* and held "that the bankruptcy court applied an improper standard in disapproving the settlement agreement." *Anderson BAP*, 377 B.R. at 873.[32]

At this point of its decision, the *Anderson BAP* could have merely reversed and remanded with instructions to assess the proposed settlement in accordance with the Supreme Court's "fair and equitable" standards. Among other things, "the proposed settlement agreement provided that the Trustee would accept $13,560 from the Defendants [the co-owners] in exchange for the estate's interest in the Cabin property, taking into account the Debtors' claimed exemption of $15,000." *Anderson BAP*, 377 B.R. at 869. The BAP correctly observed that the settlement language was unclear.

It is difficult to understand in practical terms how the settlement would work.

ty. Alternatively, it may be necessary to file a multitude of motions to request additional time to file objections to scheduled value. Each motion will require some justification with stated reasons. Each motion will require notice and opportunity to be heard or an actual hearing. Each motion will require an attendant order which grants or denies the requested relief. Interpreting Bankruptcy Rule 4003 to require filing of unnecessary objections or motions runs afoul of the principal rule of construction to interpret the Rules. FED. R. BANKR.P. 1001 ("These rules shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding.").

**32.** This holding is easy to comprehend and is unquestionably correct. Nine of the eleven circuits have explicitly adopted the Supreme Court settlement standards of *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968) and the Court's so-called "fair and equitable" standard. *Anderson BAP*, 377 B.R. at 871 n. 4 (citing the various Courts of Appeal that have adopted this settlement approval standard). The Sixth Circuit has also given a very strong indication, in both published and unpublished opinions, that "fair and equitable" is the correct standard to be used to assess a settlement. *Anderson BAP*, 377 B.R. at 870–72 (discussing and citing pertinent Sixth Circuit caselaw).

The Trustee proposed in her motion to settle the adversary proceeding by conveying to the Defendants the estate's interest in the Cabin property "after taking into account the Debtors' available exemption." Did this mean that after the conveyance by the Trustee to the Defendants, the Defendants would own the entirety of the Cabin property, subject only to their obligation to pay the Debtors their $15,000? Or did it mean that because the Debtors' exemption was $15,000, which equated to 1/4th of the value, that after the sale the Debtors would own an undivided 1/4th interest in the Cabin property, with the Defendants owning the remaining 3/4ths of the property? Assuming the former scenario were the one contemplated by the Trustee, it is difficult to see how the sale could have gone forward over the Debtors' objection since the Debtors would have lost their ownership interest in the realty without any guaranty that they could recover their $15,000 from the Defendants.

*Anderson BAP,* 377 B.R. at 869 n. 2.

After remand, it is almost inconceivable that the proposed settlement would have been approved by the bankruptcy court. Applying the proper standard, the bankruptcy court would be obligated to "weigh the conflicting interests of all relevant parties" and "make an informed and intelligent decision." *Anderson BAP,* 377 B.R. at 870–71 (citations omitted). Because the proposed settlement is not understandable, it would not have been approved.

Then what? One of two things would likely happen.

First, the parties could restructure the settlement. If the new settlement contemplated payment of money to the estate, *without* adversely affecting the debtors' interest in the Cabin property, the proper settlement standards could be applied and the new settlement might be approved.[33] After all, settlements are favored by the law. *See Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir. 1996) ("To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.' ") (citation omitted); *In re Fishell,* 47 F.3d 1168, 1995 WL 66622, at *2 (6th Cir. Feb.16, 1995) (unpublished table decision) ("The purpose of a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims.... *The law favors compromise* and not litigation for

---

**33.** In the *Anderson Bankruptcy* opinion, that court's displeasure with Trustee Olson is apparent. The court states "[t]he lawfulness of the settlement proposed by the [trustee] is at issue" because of "the representation that the bankruptcy estate has something valuable to convey to Defendants." *Anderson Bankruptcy,* 357 B.R. at 456. The bankruptcy court further stated this "court cannot approve a settlement that is fraudulent in appearance if not fraudulent in fact, for to give such approval would cast aspersion upon both the [trustee] and the court." *Anderson Bankruptcy,* 357 B.R. at 456–57. The issue identified by the court was whether the property was property of the estate or not. If the parties knew that this is the issue that would be settled, the court could then focus on "the conflicting interests of all relevant parties, 'considering such factors as the probability of success on the merits, the complexity and expense of litigation, and the reasonable views of creditors.' " *Anderson BAP,* 377 B.R. at 870–71 (citing *Bauer v. Commerce Union Bank,* 859 F.2d 438, 441 (6th Cir.1988)). We will never know whether the Defendants (and the debtors) were willing to settle because they were denied this opportunity. Contrary to the bankruptcy court's statement, there may have been "value" to settle the substantive issue of whether a possible in-kind exemption occurred thereby removing the property from the estate or not. It is not uncommon for a settlement to be approved which results in the avoidance of litigation rather than a court deciding a complicated issue of law.

its own sake ....") (citation omitted and emphasis added); *see also TMT Trailer Ferry, Inc.,* 390 U.S. at 424, 88 S.Ct. at 1163 (1968) ("Compromises are 'a normal part of the process of reorganization.' In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.") (internal citation omitted).

Second, if no new settlement was proposed, an evidentiary hearing would occur. At that hearing, one can readily predict two possible factual issues. What was the actual intent (as contrasted to the presumed intent) when the debtors declared their exemption? *Anderson Bankruptcy,* 357 B.R. at 461 (inquiring about the debtors' "true intentions"). Also, there were serious allegations made by the court that the trustee acted unlawfully or fraudulently. *Anderson Bankruptcy,* 357 B.R. at 472 (the "circumstances would be tantamount to fraud" and "in violation of the [trustee's] fiduciary duty to administer the bankruptcy estate in a lawful manner"). Should not Trustee Olson be given an opportunity to defend herself?

The BAP, for whatever reason, decided to address the extremely complicated issue in the appeal, when perhaps it did not need to do so. Alternatively, if the issue was remanded and then returned to the BAP on a subsequent appeal, there would have been a complete record, with findings of fact, rather than only the bankruptcy judge's observations, to be considered and reviewed. Because the BAP decided to march ahead in challenging and inclement weather, so must this court.

#### 2. Is the Cabin Property Wholly Exempt?

The short answer from the BAP is "yes." The more important question is whether the BAP is correct in its analysis of the issue.

*Statutory interpretation.* In a prior case, the Sixth Circuit BAP stated:

> As the United States Supreme Court has instructed courts in examining the provisions of the Bankruptcy Code, "[w]e have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." That statement is consistent with the United States Supreme Court's principles that statutory interpretation is a holistic endeavor which must begin with the language of the statute itself. Resort to an examination of legislative history is appropriate only to resolve statutory ambiguity, and in the final analysis, such examination must not produce a result demonstratively at odds with the purpose of the legislation. The Sixth Circuit has likewise noted that statutes "must be read in a 'straightforward' and 'commonsense' manner," and that "[w]hen we can discern an unambiguous and plain meaning from the language of a [statute], our task is at an end."

*Andersson v. Sec. Fed. Sav. & Loan of Cleveland (In re Andersson),* 209 B.R. 76, 78 (6th Cir. BAP 1997) (internal citations omitted).

Regretfully, the *Anderson BAP* did not engage in any meaningful statutory interpretation of the exemption statute, most notably § 522(d). In *Anderson,* the debtors claimed the Cabin property as exempt under § 522(d)(5). How does the BAP interpret the language in the catchall exemption that limits the exemption to a specific monetary amount? § 522(d)(5). Based upon its rejection of other reported decisions, some discussed below, it is apparent that the BAP does not believe the monetary limitation carries much weight.

As a matter of statutory interpretation, why should this language be ignored?

The BAP also fails to address the interplay between Rule 4003, the required information to be listed on Schedule C, and the possible importance of bankruptcy policy concerns. Are not these appropriate considerations to interpret the exemption statute at issue? [34]

*Caselaw.* This court is required to briefly discuss reported cases that have interpreted *Taylor* and may be helpful to achieve a reasoned analysis of the in-kind exemption problem. Some of the cases below were cited or discussed by the *Anderson BAP* opinion and some were not. By a careful reading, one may realize that some courts may confuse or conflate the issues of "what is actually claimed as exempt" versus "the presumed existence of an in-kind exemption."

The *Anderson Bankruptcy* opinion heavily criticizes and rejects three reported decisions by Michigan bankruptcy courts which interpreted *Taylor. Matter of Heflin,* 215 B.R. 530 (Bankr.W.D.Mich. 1997); *In re Bregni,* 215 B.R. 850 (Bankr. E.D.Mich.1997); *In re Einkorn,* 330 B.R. 570 (Bankr.E.D.Mich.2005). The *Anderson BAP* opinion also disagrees with the results of the three Michigan cases as shown by this quotation:

> The Defendants argue, and the bankruptcy court agreed, that *when a debtor schedules an exemption with identical market and exemption values, as in this case, the debtor is clearly indicating the intention to exempt the property in full, regardless of its actual value.* In contrast, the Trustee contends that a debtor's mere listing of identical market and exemption values is insufficient to manifest the required intent. According to the Trustee, listing identical values simply indicates that the debtor desires to exempt an interest in property up to the specific dollar amount shown. Therefore, maintains the Trustee, if a debtor wants to exempt a piece of property in its entirety, he or she must list its market value as unknown and its exempted value as 100%, or make some similar notation evidencing such an intent.
>
> We reject this argument.

*Anderson BAP,* 377 B.R. at 875 (emphasis supplied).

In rejecting the trustee's argument, and notwithstanding the italicized language in the above quote, it is not initially apparent that the BAP was accepting the argument of the defendants. The BAP first makes a narrow statement that, based upon the exemption, "it was clear that the Debtors were seeking to exempt their full interest in the Cabin property which they believed had a value of $15,000." *Anderson BAP,* 377 B.R. 875–76. The BAP could have stopped here, discussed *Taylor,* and wrapped up the opinion.[35]

---

**34.** It should be noted that the *Anderson BAP* mainly focuses on selected reported decisions. Some of the decisions contain a smattering (or more) of statutory interpretation. However, in this judge's belief, none of the reported decisions to date addresses statutory interpretation of the exemption statute in any great detail. To be fair to the BAP, it is understandable why it did not engage in any statutory interpretation analysis. It merely stated its interpretation of the *Taylor* decision, as have a number of other courts.

**35.** Even though the defendants and the trustee framed a much broader issue, it is very puzzling why the BAP choose to address it in the context of the *Anderson* case. In its standards of review, the BAP stated that "the decision of the bankruptcy court can be affirmed if it is correct for any reason, including a reason not considered by that court." *Anderson BAP,* 377 B.R. at 868 (citing *Gibson v. Gibson (In re Gibson),* 219 B.R. 195, 200 (6th Cir. BAP 1998) (additional citation and internal quotation marks omitted)). The BAP recognized the Schedule C claimed exemption

However, the BAP then immediately and considerably broadened its opinion and the possible effect of the opinion in the bankruptcy world.[36] "Moreover, we are persuaded generally that a debtor's listing of an exemption in an amount sufficient to exempt all of the available (i.e., unencumbered) value in the property indicates his or her intent to exempt the property in full." *Anderson BAP*, 377 B.R. at 876. Thus the *Anderson BAP* joined the *Anderson Bankruptcy* opinion to reject *Heflin, Bregni, Einkorn,* and many other decisions, including opinions decided by various Circuit Court of Appeals.

In *Heflin,* the debtor claimed federal exemptions totaling $15,579 in real property without any objection the chapter 7 trustee. The debtor scheduled the real property value at $16,000 and scheduled a lien at $431.25. The debtor asserted that the exemptions plus the lien exceeded the value and there was no net equity to the estate. (Under the *Anderson BAP* decision, the *Heflin* trustee would lose any possibility of administering the property because of the scheduled value and scheduled lien.) Although *Heflin* involved a requested abandonment, the question was whether the property was removed from the estate under the *Taylor* decision. Without any appreciable statutory analysis, *Heflin* examined *Taylor* and distinguished it, relying upon a decision by the Ninth Circuit, *Hyman,* discussed below. *Heflin* held "a trustee is not legally required to object to a debtor's scheduled value relating to specific property." *Heflin,* 215 B.R. at 535. With regard to a possible in-kind exemption, *Heflin* also stated "[i]f a debtor intends to fully exempt a particular piece of property in its entirety, regardless of its value, then the debtor should unambiguously express this intention in his schedules." *Heflin,* 215 B.R. at 536. Although not cited in *Heflin,*

as "1/2 interest in old cabin ... that may have a total value of about $30,000. The debtors' interest would be $15,000." *Anderson BAP*, 377 B.R. at 869. It is not stated, or maybe the record on appeal is void (perhaps another reason for a partial reversal and remand), where this information appeared on Schedule C. If the "1/2 interest in old cabin" was in column 3 and the "debtors' interest would be $15,000" was in column 4, it is fairly easy to reach a conclusion that the debtors' entire interest in the cabin was "claimed exempt" without reference to the asserted or estimated value. *See* discussion herein, pp. 27–29, regarding Rule 4003 and Official Form 6C.

If findings had been made by the bankruptcy court, or the record on appeal provided sufficient information, the BAP might have summarily affirmed because the debtors manifested an unambiguous intention to exempt their entire interest and the trustee failed to timely object. Indeed, even the BAP's characterization of the "debtors' interest" may have sufficed absent an explicit record. This would fall squarely (or at least with 90% overlap) on the unstated premise of *Taylor,* where the exemption was "unknown." There would have been no reason for the BAP to

venture into the Michigan blizzard in the Upper Peninsula. The issue of "identical market and exemption values"—what this court has labeled the "judge-invented mechanical formula"—could await a determination in a case that had much clearer facts.

The Sixth Circuit has refrained from deciding issues or passing upon a court's analysis in some of its prior decisions. *See, e.g., Talbert v. City Mtg. Servs. (In re Talbert),* 344 F.3d 555, 562 (6th Cir.2003) ("After reviewing this question of law *de novo,* we agree with the district court that the more prudent analytical approach to resolving the 'strip-off [§ 506(d)] question presented in this matter is to affirm on the basis of the statutory interpretation analysis contained in *Dewsnup [v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992)]—and on *that* basis only. We thus express no opinion on the bankruptcy court's analysis."). The *Anderson BAP* Panel could have done likewise.

36. The opinion may have many ramifications, not only in chapter 7 cases, but in chapter 13 cases, e.g., § 1325(a)(4), and in chapter 11 individual cases under BAPCPA, e.g., § 1129(a)(7)(A)(ii) and (a)(15).

this requirement is consistent with a ruling by the First Circuit that a debtor's claim of exemption must be unambiguously stated. *Mercer v. Monzack*, 53 F.3d 1 (1st Cir.1995) (discussed elsewhere in this opinion).

In *Bregni*, decided by Chief Judge Rhodes in the Eastern District of Michigan, the chapter 7 joint debtors claimed an exemption in a condominium in the amount of $30,000. They valued the property at $120,000 and scheduled a mortgage of $90,000, thereby claiming the estate had no equity in the property. However, within nine months of the bankruptcy petition, the property sold for $38,000 more than the scheduled value. *Bregni*, 215 B.R. at 851. One of the debtors (the other debtor settled with the trustee) asserted the excess sale amount belonged to her rather than to the estate, relying upon *Taylor*, Quoting a prior Michigan bankruptcy court opinion, *In re Gaylor*, 123 B.R. 236, 238 (Bankr.E.D.Mich.1991), it was noted and emphasized that the value limitations in the exemption statute mean something and cannot be ignored. *Bregni*, 215 B.R. at 852. After discussing and interpreting *Taylor*, *Green* (an Eleventh Circuit decision discussed below), and other decisions, *Bregni* rejected any requirement that a trustee object to scheduled values and rejected the debtor's assertion that the property was completely exempted. *Bregni*, 215 B.R. at 853. The *Anderson BAP* opinion purportedly overrules *Bregni*.

Eight years later, *Einkorn*, also authored by Judge Rhodes, was decided. The debtors owned a timeshare. They claimed a § 522(d)(5) catchall exemption in the amount of $1.00. They scheduled the value as $1,000 and scheduled a lien on the timeshare as $1,000. No objection to the claimed exemption in the amount of $1.00 was filed. About eight months after the bankruptcy filing, the trustee sought to sell the timeshare property and the debtors objected. Relying on *Taylor*, they asserted the property was fully exempt. Citing *Bregni* and other cases, the bankruptcy court limited the exemption to the actual amount stated, i.e., $1.00, *Einkorn*, 330 B.R. at 572. *Einkorn* is also overruled by the *Anderson BAP's* adoption of the judge-invented mechanical formula.

The *Anderson BAP* cites an Eleventh Circuit opinion to justify its reliance upon scheduled intent. *Allen v. Green (In re Green)*, 31 F.3d 1098 (11th Cir.1994). The *Anderson BAP* reads *Green* far too broadly. In *Green*, "[b]oth parties agree[d] that Green's listing of her lawsuit at a value of one dollar indicated that its value was contingent, not that it had an actual present value of one dollar" and the "parties also agree[d] that Green exempted the lawsuit for its entire reported value of one dollar." *Green*, 31 F.3d at 1099. The trustee *conceded* that one dollar was a contingent value which brought the claimed exemption under the Taylor umbrella and placed the trustee on notice. *Cf. Soost v. NAH, Inc. (In re Soost)*, 262 B.R. 68, 73–74 (8th Cir. BAP 2001) ("We hold that the debtor's $1.00 exemption effectively exempted an interest in the subject real estate equal to $1.00 in value, nothing more.") Although *Soost* involved a § 522(f) lien avoidance issue, the issue addressed was the amount "claimed exempt." This court believes there exists no valid legal distinction of "claimed exempt" under § 522(*l*) and § 522(f).

The Eighth Circuit has addressed the issue but the *Anderson BAP* also discounts that decision. *Stoebner v. Wick (In re Wick)*, 276 F.3d 412 (8th Cir.2002). In *Wick*, the chapter 7 debtor listed stock options as exempt and, similarly to *Anderson* and this case, used the catchall exemption under § 522(d)(5). On Schedule C, in column 3, the amount of the

exemption was listed as "unknown." *Wick,* 276 F.3d at 414. The BAP states the facts were "identical to those in *Taylor.*" *Anderson BAP,* 377 B.R. at 877. In *Wick,* as in this case but *not* in *Anderson,* the bankruptcy court actually held a hearing. The *Wick* bankruptcy court found, based upon the facts of that case, that the debtor only intended to partially exempt the stock options "to the extent of the remaining dollar amount allowed by law." *Wick,* 276 F.3d at 414.

After the district court reversed because it determined the stock options were fully exempted and *Taylor* barred any untimely exemption, the Eighth Circuit heard the appeal. It correctly rejected *Wick's* argument that the stock options were "fully exempt" stating that the "unknown" listing "may signal nothing more than that the asset has not been valued or that the debtor is unsure of how to come up with an accurate market value." *Wick,* 276 F.3d at 416. *Wick* stands for the proposition that when there exists a specific dollar limit in the statute, listing the current market value [in column 4 of Schedule C] does not result in the asset becoming fully exempt. *Id.*

This court agrees with the Eighth Circuit in *Wick.* The *Anderson Bankruptcy* opinion and the *Anderson BAP* opinion disagree and would give the entire asset to the debtor.

Many decisions discuss a Ninth Circuit decision, *Hyman v. Plotkin (In re Hyman),* 967 F.2d 1316 (1992). *Hyman* involved a situation where the trustee wanted to sell the debtors' residence. The debtors' scheduled value for the property was $415,000. They listed liens which totaled $347,611. The exemption claimed, under California law, was $45,000. The trustee did not object to the exemption because it was proper under the law.

In *Hyman,* the debtors argued the property was fully exempt under § 522(*l* ) because "by listing 'homestead' instead of 'homestead exemption' on the schedule of exempt property, they were claiming as exempt property their entire homestead, not just $45,000." *Hyman,* 967 F.2d at 1319. The Ninth Circuit focused on whether the entire property was claimed exempt. The debtors "did not sufficiently notify others that they were claiming their entire homestead as exempt property; their schedule only gave notice that they claimed $45,000 as exempt, which is the proper amount. . . ." *Hyman,* 967 F.2d at 1319. Therefore, "the trustee had no basis for objecting, and could well have suffered the bankruptcy judge's ire had he objected to the $45,000 exemption to which the [debtors] were clearly entitled." *Id.* Later, *Hyman* recognizes a practical reality. Until property is sought to be sold and "the bids are in" the sale price is unknown. *Id.* at 1320. *Hyman* explicitly states "the relevant figure is the actual sale price of the property, not the value of the property listed by the debtor on his schedule of assets." *Id.* at n. 9. The debtors were limited to the $45,000 amount listed in their schedules.

Both the *Anderson Bankruptcy* and *Anderson BAP* opinions distinguish *Hyman.* The *Anderson Bankruptcy* decision looks at the scheduled value ($415,000), the scheduled liens ($347,611) and the claimed exemption amount ($45,000). After adding the liens and exemption amount, and subtracting that total from the asserted value, there was nonexempt equity left for the estate. Based upon this formula, the debtors did not establish the requisite presumed intent to fully exempt the property. *Anderson Bankruptcy,* 357 B.R. at 467–69.

*Hyman* is further distinguished because it is based upon the "peculiarities of the state exemption claimed." *Anderson*

*Bankruptcy*, 357 B.R. at 467–68; *Anderson BAP*, 377 B.R. at 876 (citing *Mullis v. AgGeorgia Farm Credit, ACA (In re Jones)*, 357 B.R. 888, 892 n. 5 (Bankr.M.D.Ga.2005) (explaining *Hyman* "was based on a peculiarity of California exemption law" because the exemption applies to the proceeds after a sale)).

One reading of *Hyman*, perceived by *Heflin* and *Bregni*, is that when a debtor claims a specific amount as exempt, the debtor is limited to the requested amount. Another reading of *Hyman*, perceived by the *Anderson* opinions, is that *Hyman* does not cover a situation where the scheduled value is equal to the exemption amount claimed. *Anderson BAP*, 377 B.R. at 876 (citing *In re Peterman*, 358 B.R. 801, 804 (Bankr.D.Colo.2006)). Which interpretation is correct?

The Ninth Circuit BAP has answered this question. About four months before *Anderson* was decided by the Sixth Circuit BAP. *Chappell* was released. *Klein v. Chappell (In re Chappell)*, 373 B.R. 73 (9th Cir. BAP 2007). Unlike *Hyman*, *Chappell* arose in Washington state and federal exemptions were claimed. Like *Anderson* and this case, a specific federal exemption under § 522(d) was claimed in *Chappell*.

In *Chappell*, the chapter 7 debtors scheduled their residence as an asset and scheduled the value at $350,000. The debtors stated the consensual liens on the property to be $328,488.75. The total balance of the scheduled value, $21,511.25 was claimed exempt under § 522(d)(1), the federal exemption applicable to a residence. *Chappell*, 373 B.R. at 75. The trustee did not object to the exemption nor did any party request an abandonment.

About two years later, the secured party moved for relief from stay and asserted the residence was worth $350,000 as stated on the debtors' schedules. The *Chappell* trustee opposed the relief asserting that the residence had increased in value to $550,000 and argued a sale would pay creditors 100% of their claims and return a surplus to the debtors. *Id.*

The *Chappell* debtors argued at the time the case was filed there was no equity for the estate because the scheduled value was eaten up by the consensual liens and then fully covered by their claimed exemption. After a hearing, the bankruptcy court agreed with the debtors based upon a finding the residence was worth $350,000 as of the petition date. Because the formula was satisfied (in this case based upon some proof rather than a mere reliance on asserted scheduled value), "the bankruptcy court concluded that because the value of the property was equal to or less than the sum of the secured obligations and the exemption claimed, the residence was withdrawn from administration pursuant to § 522(*l*) at the expiration of the time to object to exemptions and there was no remaining interest in the residence for the trustee to administer." *Chappell*, 373 B.R. at 76. The trustee timely appealed.

The Ninth Circuit BAP identified one issue as whether the federal exemption claimed by the *Chappell* debtors distinguished the case from *Hyman*, in which those debtors claimed the state law exemption. Restated by this court, the issue may be characterized as whether, according to the *Anderson Bankruptcy* and *Anderson BAP* opinions, the "peculiar" nature of the California exemption statute negates the Ninth Circuit's analysis about monetary limitations contained in certain exemptions.

*Chappell* first notes that exemption rights are determined as of the bankruptcy filing date. *Chappell*, 373 B.R. at 77 (citing *White v. Stump*, 266 U.S. 310, 313, 45 S.Ct. 103, 69 L.Ed. 301 (1924)) (other citations omitted). *See also Lasich v. Wick-*

*strom,* 113 B.R. 339, 343(Bankr.W.D.Mich.1990). In answer to the debtors' position, *Chappell* states:

> In making their "aggregate"-interest-in-the-fee argument, Debtors ignore two important facts. First, nothing in the debtors' Schedule C demonstrates an intent to claim ... an "aggregate" or entire interest. The value of their claimed exemption is stated simply as "$21,-511.25," the arithmetic difference between the value of the residence and the consensual liens. As reasoned in *Hyman v. Plotkin (In re Hyman)*, 967 F.2d 1316, 1319 n. 6 (9th Cir.1992), because the time to object to claimed exemptions is relatively short, "it is important that trustees and creditors be able to determine precisely whether a listed asset is validly exempt simply by reading a debtor's schedules." Any ambiguity in the schedules is to be construed against the debtor. *Id.*
>
> Second, debtors ignore the dollar limit imposed by § 522(d)(1). As the trustee concedes, the maximum exemption available under § 522(d)(1) is $36,900 (plus any available "wild card" amount under § 522(d)(5)). Hence, the [debtors'] exemption claim did not exceed the maximum amount available to them.

*Chappell,* 373 B.R. at 77–78.

*Chappell* responds to the *Anderson* opinions that constrain *Hyman* to the "peculiarities" of the California exemption statute. The Supreme Court "observed that most of the federally listed exemptions at § 522(d) are explicitly restricted to the 'debtor's aggregate interest' or the 'debtor's interest' up to a maximum amount, noting that the federal homestead exemption at that time allowed the debtor to exempt '[t]he debtor's aggregate interest, not to exceed $7,500 in value, in ... a residence.'" *Chappell,* 373 B.R. at 79 (discussing and quoting *Owen v. Owen,* 500 U.S. 305, 310, 111 S.Ct. 1833, 1836, 114 L.Ed.2d 350 (1991)). Also, in *Owen,* the Supreme Court indicated that federal exemptions and state exemptions should be treated similarly, at least in the § 522(f) context. *Chappell,* 373 B.R. at 79 (discussing *Owen,* 500 U.S. at 313, 111 S.Ct. at 1838).

This court believes that the *Owen* Supreme Court language discussing § 522(f) is equally compelling when § 522(d) is interpreted. After discussing *Hyman* and many of the other cases addressed herein, *Chappell* finds "*Bregni* and *Heflin* persuasive in determining the matter before us." *Chappell,* 373 B.R. at 82. As for the *Anderson Bankruptcy* opinion (*Anderson BAP* had not yet been decided), *Chappell,* after noting the "1/2 interest in old cabin," states: "The facts in *Anderson* are, therefore, more akin to those of *Taylor* in that the debtors sought to exempt their entire interest in the asset, regardless of its value. On this basis we find *Anderson* distinguishable and not inconsistent with our determination here." *Chappell,* 373 B.R. at 82 n. 9.

*Chappell* then decides the issue consistently with the *Hyman, Heflin* and *Bregni* interpretation of the federal exemption statute. The debtors' residence became property of the estate and no abandonment occurred. The debtors are entitled to receive the amount of their "unopposed exemption up to the maximum amount permitted by § 522(d)," and the debtors' election of the federal exemption does not change the result. *Chappell,* 373 B.R. at 83.

The last case to be discussed was not addressed, or even cited, by the *Anderson Bankruptcy* or *Anderson BAP* opinions. It is an opinion rendered by the Court of Appeals for the Sixth Circuit. *Lim v. Greenfield (In re Greenfield),* 65 Fed. Appx. 549 (6th Cir.2003). The opinion pre-

dates the *Anderson* bankruptcy case that was filed in May 2004.

*Greenfield* was decided by Chief Judge Boggs, Judge Daughtrey and Judge Guy. Although it was a per curiam opinion that was not selected for publication, *Greenfield* is now the only known Sixth Circuit opinion that addresses the issue at hand. The debtor, Mark Greenfield, married in April, 1999. Shortly thereafter, the debtor quit-claimed an interest in his residence to his new wife and himself. The debtor, in a separate transaction, also used approximately $5,000 of his funds to purchase his new wife a Cadillac Seville.

Slightly less than five months later, the debtor filed a chapter 7 bankruptcy case. The *Greenfield* trustee instituted an avoidance action to recover the asserted fraudulent conveyances under § 548. A defense was mounted that because the trustee failed to timely object to the debtor's exemption, the trustee was barred from avoiding the transfer by the debtor. *Greenfield*, 65 Fed.Appx. at 551–52. The Sixth Circuit stated:

> "In this case, the debtor did not claim an exemption for the entire property under § 522(b)(2)(B) (applicable to entireties property). Instead, he claimed an exemption under § 522(d)(1), which is limited to a dollar value of $16,150. Thus, even accepting defendants' argument, the bankruptcy court would have retained jurisdiction over the property because the debtor did not exempt the entire property. *See In re Bregni*, [215 B.R. 850, 852 (Bankr.E.D.Mich.1997)] (debtor's property remains property of the estate to the extent its value exceeds

the statutory amount which the debtor is permitted to exempt).

> . . . .

> If the transfer is voided, [the debtor] will still receive his $16,150 exemption, but the property will no longer be held under a tenancy by the entireties. Thus, the entire property (minus the exemption) can be used to satisfy the debts of the [the debtor's] creditors."

*Greenfield*, 65 Fed.Appx. at 552.

The Sixth Circuit has explicitly cited *Bregni* approvingly. Although the unpublished decision is not binding, it is a strong signal that the Sixth Circuit will agree with those cases that conclude the monetary limitations in § 522(d)(1) and (5) should be enforced. It is possible the Sixth Circuit would also reject the judge-invented mechanical formula adopted by the *Anderson Bankruptcy* opinion and affirmed by the *Anderson BAP* opinion.

### 3. Is the Anderson BAP Opinion Correct?

A preliminary issue exists. Is the *Anderson BAP* opinion binding on this court? It is not.

■ Bankruptcy Appellate Panel decisions are binding in the cases being decided. However, they are not generally binding within the circuit, across district lines, or even in the bankruptcy courts located in the district in which the appeal arose.[37] An observation by Judge Crabb regarding district court and BAP appellate decisions is instructive and enlightening:

> and advocating that BAP decisions *ought* to be made binding upon all bankruptcy courts and district courts within the circuit) *with* Kathleen P. March & Roberto V. Obregon, *Are BAP Decisions Binding on Any Court?*, 18 Cal. Bankr.J. 189 (1990).

**37.** Discussions about the possible precedential effect of bankruptcy appellate panel decisions have been the subject of law review articles. *Compare* Erwin Chemerinsky, *Decision–Makers: In Defense of Courts*, 71 Am. Bankr.L.J. 109, 128 (Spring 1997) (herein "Chemerinsky") (discussing the role of BAPs

Neither district courts sitting as appellate courts nor bankruptcy appellate panels in their present incarnation provide a satisfactory means of appeal from bankruptcy court rulings. *The two have the same major drawback: the appellate decisions they reach do not bind each other or any court except the court from which the appeal is taken.* To the extent their decisions have no precedential effect (as distinct from the persuasive effect a well-reasoned opinion may have), the courts or panels serve only the most basic functions of appellate review, that of correcting particular errors in specific cases and providing some supervision over the bankruptcy courts. They do not foster predictability: so long as litigants can choose their forum for appeal, they can shop for the one they think will be most favorable to their position. They do not build a coherent body of law because their decisions issue from too many sources to produce coherency. As a result, bankruptcy practitioners have little guidance in advising their clients. Many of the most basic issues in bankruptcy law have no definitive resolution.

Barbara B. Crabb, *In Defense of Direct Appeals: A Further Reply to Professor Chemerinsky,* 71 Am. Bankr.L.J. 137, 140 (Spring 1997) (emphasis added and footnotes omitted).

■■■ This judge agrees that BAP decisions are to be given equivalent deference to that accorded to district court appellate opinions. All opinions should be treated as extremely persuasive and generally followed. However, when a bankruptcy court has a deeply considered and well-reasoned analysis, the court is free to disagree with the BAP or the district courts.[38] This is healthy for the system: it nurtures the growth of the law.

Even absent considering *Greenfield* and the other cases discussed above, the statutory interpretation of § 522, the examination of the appropriate role of the Bankruptcy Rules and the Official Forms, and the consideration of bankruptcy policy, requires a conclusion that there exists no presumed "in-kind" exemption of property, based upon a debtor's scheduled value, pursuant to a judge-invented mechanical formula. Scheduled values, as contrasted to amounts claimed exempt, are not binding upon parties in interest, including creditors and the trustee. After reading and considering the caselaw addressed above, this conclusion is even more compelling.

This judge agrees with the first part of the *Anderson BAP* opinion. However, strong disagreement with the second portion of the BAP opinion is respectfully registered.[39]

### D. The Debtor's Standing to Object to the Sale.

■■■ In this case, the Debtors assert that they are parties in interest and therefore have standing to object to the sale. The court agrees that debtors are parties in interest in their chapter 7 case. But being a party in interest for purposes of the bankruptcy case does not confer standing to appear and be heard on every

---

**38.** This is different from the precedential effect of the Circuit opinions. Those opinions are unquestionably binding if they are on point. *See* n. 41 infra.

**39.** Disclosure should be made that this judge was a member of the BAP when *Anderson* was

decided and, if he were on the Panel, a written dissent would have been filed. Currently, the Sixth Circuit BAP has no procedure for any *en banc* consideration of appeals. If it did, *Anderson* may have been a candidate.

contested matter or adversary proceeding arising in the base case.

■■■■■ To demonstrate standing a party must meet three elements: (1) actual or threatened injury resulting from the conduct or action of another; (2) an injury which can be traced to the challenged conduct or action; and (3) the injury may be redressed by a favorable decision by the court. *Matter of Lansing Clarion Ltd. P'ship*, 132 B.R. 845, 848 (Bankr. W.D.Mich.1991). An actual or threatened injury is shown when a party's pecuniary interest may be affected by the outcome of the decision. *Id.* "Debtors, particularly Chapter 7 debtors, rarely have such a pecuniary interest because no matter how the estate's assets are disbursed by the trustee, no assets will revert to debtor." *Cult Awareness Network, Inc. v. Martino (In re Cult Awareness Network, Inc.)*, 151 F.3d 605, 607 (7th Cir.1998) (citing *In re Schultz Mfg. Fabricating Co.*, 956 F.2d 686, 692 (7th Cir.1992)). After a chapter 7 trustee is appointed and is administering the case, a chapter 7 debtor only has standing to object to claims if it appears there will be a surplus. *See, e.g., In re Coleman*, 131 B.R. 59, 60–61 (Bankr. N.D.Tex.1991). This analysis is also applicable to instances when a trustee seeks to sell property of the estate. In this case, the Debtors and the Trustee agree there will be no surplus.

■■■ A debtor may also appear and object in any contested matter that might "affect the terms, conditions and extent of [his or her] discharge." *In re El San Juan Hotel*, 809 F.2d 151, 155 n. 6 (1st Cir.1987). In this case, approval of the auction sale does not affect the Debtors' discharge.

Absent a potential surplus or an adverse impact on a debtor's discharge or exemption, this court holds that a debtor lacks standing to object to a trustee's proposed sale of estate property. *Cf. Willemain v. Kivitz (Matter of Willemain)*, 764 F.2d 1019, 1022–23 (4th Cir.1985); *Matter of Drost*, 228 B.R. 208, 209 (Bankr.N.D.Ind. 1998).

If a trustee would seek to sell an asset for less than a debtor's claimed monetary exemption, without question, the debtor would have standing to object to the sale. By seeking to deny a debtor an exemption, the debtor's pecuniary interest is adversely affected. In this case, the Debtors will receive the full amount of their total exemption in the stock to be sold.[40]

Finally, this court has considered and rejected the Debtors' argument that the TTAP stock restrictions in the Bylaws were not recognized and the Debtors had a right to object as shareholders. *See* discussion and conclusion in Part V.2. above.

Because the Debtors have no standing to object to the Trustee's sale, it is not now necessary to determine whether the Debtors are estopped from opposing the sale.

## VI. *CONCLUSION*

The Trustee may sell the TTAP stock. He properly followed the stock sale restrictions both before and during the auction sale. The Debtors lack standing to object to the sale.

The Debtors' aggregate exemption in the stock totals $14,150, not one penny more, not one penny less. They are entitled to apply this exempt amount to their successful bid to buy the stock.

Although the Debtors valued the stock at $1.00 on their Schedule C and took their

---

**40.** The Debtors' receipt of their claimed exemption shall likely be by a credit toward the stock purchase price at closing. Also, the

Trustee has stated that the Debtors' claimed exemption will be fully paid. Tr. II at 7.

exemption in a greater amount than the value, this did not result in a presumed "in-kind" exemption which removed the stock from the estate. The *Anderson BAP* decision, being unsound as a matter of law, does not require that the stock be removed from this bankruptcy estate.[41] The Trustee is not prevented from selling the stock in this case.

An order shall be entered accordingly.

**41.** This judge is hopeful that the Sixth Circuit Court of Appeals will soon rule on this important issue. *Stare decisis* is welcomed.

Principles of *stare decisis* serve many valuable ends. First, they enhance *efficiency*. If appellate precedents are followed, there is no need to litigate the same issue repeatedly in different cases. The question is decided in an appellate court, and lower courts are then responsible for following that decision. Second, binding appellate precedents foster *consistency*. If each bankruptcy judge is free to decide an issue for himself or herself, varying *results* are inevitable. The outcome of the legal questions is likely to depend on the identity of the judge. Binding appellate precedents thus foster fairness and equity among litigants. Third, binding appellate precedents foster *predictability* in the law. Individuals can know the law and base their conduct accordingly. Lawyers can know the law and advise their clients accordingly. Without binding precedent, the law is uncertain and the benefits of predictability are lost. *Chemerinsky*, 71 Am. Bankr.L.J. at 128 (emphasis supplied).

Predictability about this issue within this district has been lacking for quite some time. With the *Anderson BAP* opinion, efficiency, consistency and predictability shall be lessened in the entire circuit. Regardless of its eventual decision, only the Sixth Circuit can settle this issue.